**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **EUGENIE BARKY, KHALID M. ALI,** | ) | |
| **TEJINDER SINGH, ALBERTO GONZALEZ,** | ) | |
| **and MELECA DURAKOVIC,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 05 C 6016 |
| v. | ) | |
| | ) | |
| **METRO KITCHEN & BATH, INC.,** | ) | |
| **METROPOLITAN KITCHEN & BATH, LLC,** | ) | |
| **STEVEN A. RUTSTEIN, and LORI WEBER** | ) | |
| **RUTSTEIN,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiffs Eugenie Barsky ("Barsky"), Khalid M. Ali ("Ali"), Tejinder Singh ("Singh"),

Alberto Gonzalez ("Gonzalez"), and Meleca Durakovic ("Durakovic"), (collectively,

"Plaintiffs"), sued Defendants Steven A. Rutstein ("Rutstein") and Lori Weber Rutstein ("Weber

Rutstein" or "Mrs. Rutstein") and two corporations affiliated with one or more of the Rutsteins,

alleging violations of the civil Racketeer Influenced Corrupt Organizations Act ("RICO"). The

Court held a bench trial on September 8, 2008 and September 9, 2008. (R. 99-1, 100-1.)

Following the bench trial, each party filed post-trial submissions in lieu of closing arguments. In

addition, Plaintiffs filed their motion for leave to file a third amended complaint. (R. 101-1.)

For the reasons discussed below, the Court denies Plaintiffs' motion for leave to file their third

amended complaint and enters judgment in favor of Defendants.

# BACKGROUND

Pursuant to Federal Rule of Civil Procedure 52, the Court makes the following findings of fact based on the testimonial and documentary evidence presented at trial on September 8–9, 2008. The Court makes these findings based on its assessment of the witnesses' credibility after considering the evidence presented at the hearing and carefully observing the demeanor of each witness—including the witness' tone of voice and facial expressions—as he or she testified.

## I.    Procedural Background

Plaintiffs filed their original Complaint on October 19, 2005, alleging three counts of RICO violations pursuant to 18 U.S.C. §§ 1962(a), (c), and (d) and 1964(a) and (c). (R. 1-1.) During almost three years of discovery, the Court admonished Plaintiffs' counsel for failing to appear or otherwise adhere to the Court's deadlines at least six separate times. On May 19, 2008, the Attorney Registration & Disciplinary Commission of the Supreme Court of Illinois (the "ARDC") determined that counsel for Plaintiffs, David M. Levin, had engaged in misconduct and barred him from practicing law in Illinois. Accordingly, the Court granted his motion to withdraw on June 26, 2008. (R. 90-1.)[1] Plaintiffs obtained new counsel, and the parties filed their final pretrial order on August 6, 2008. (R. 95-1.) The Pretrial Order characterized this case as "an action for RICO violations," invoking federal question jurisdiction pursuant to 28 U.S.C. § 1331. (R. 95-1 at 1.)

On September 8, 2008, the first day of trial, the Court granted Plaintiffs' oral motion to

---

[1] This suspension continues. *See* David Michael Levin, ARDC Record, *available at:* https://www.iardc.org/ldetail.asp?id=265477479 (last visited November 20, 2008.) In addition, the ARDC previously suspended Mr. Levin from November 2, 2006 to May 2, 2007, also for misconduct. As a result of that suspension, Mr. Levin withdrew from the case during the pendency of the suspension. (*See* R. 39-1.)

dismiss Defendant Metropolitan Kitchen & Bath LLC without prejudice, (R. 99-1), and the parties reached a conditional settlement in principle between Plaintiffs and all but one Defendant. As the remaining Defendant was not present, the parties proceeded with trial. On the second day, the parties abandoned the attempted settlement because the condition was not met. Over the course of two days of testimony, each Plaintiff testified, as well as Mr. and Mrs. Rutstein. Following testimony, the parties agreed to submit post-trial briefs in lieu of closing arguments.

## II.     Findings of Fact

Plaintiffs in this case shared the common desire to improve their homes, and in particular, their kitchens. For this purpose, each Plaintiff hired general contractor Avdija Perazic of Poda Construction to perform substantial renovation and/or reconstruction of their homes. In each case, Perazic introduced Plaintiffs to Defendant Steven Rutstein and suggested that the Plaintiffs purchase their custom or semi-custom kitchen cabinets from Mr. Rutstein. Each of the Plaintiffs then submitted orders and deposits to Mr. Rutstein in response to invoices printed on Metro Kitchen & Bath Inc. letterhead. Each of the Plaintiffs then experienced years of delay as the general contractor failed to complete their homes, and further delays when Mr. Rutstein failed to deliver their kitchen cabinets. Ultimately, each of the Plaintiffs obtained kitchen cabinets from other sources. In October 2005, approximately one year after the Plaintiffs first dealt with Mr. Rutstein, Plaintiffs brought this suit alleging that Defendants engaged in a pattern of mail and wire fraud that constituted civil RICO violations. Plaintiffs did not sue contractor Avdija Perazic, and he is not a party to this action.

## A.      The Parties

Plaintiffs Barsky, Ali, and Gonzales each reside in Lincolnwood, Illinois.  (R. 95-1 at 5, ¶¶ 1-2, 4.)  Plaintiff Singh resides in Morton Grove, Illinois, (*Id.* at 5, ¶ 3), and Plaintiff Durakovic resides in Skokie, Illinois.  (*Id.* at 5, ¶ 5.)

Defendants Mr. and Mrs. Rutstein reside in Wilmette, Illinois.  (*Id.* at 5, ¶ 6.)  Mr. Rutstein performs kitchen and bath consultation and design work, having worked in that industry since 1978 and spent over 18 years with Kitchen Distributors of America ("KDA").  At times relevant to this lawsuit, the Rutsteins involved themselves with at least two Illinois corporations engaged in kitchen and bath design and cabinet sales: 1) Defendant Metro Kitchen & Bath Inc.; and 2) Defendant Metropolitan Kitchen & Bath, LLC.  (*Id.* at 5-8.)[2]

Mrs. Rutstein incorporated Defendant Metro Kitchen & Bath Inc. ("Metro Inc.") in 2001.  (*Id.* at 6, ¶ 10.)  The Rutsteins ran Metro Inc. out of their Wilmette residence.  (*Id.* at 5–6, ¶¶ 16, 27.)  Metro Inc. employed Mr. Rutstein as its principal kitchen designer and cabinet salesman.  (*Id.* at 6, ¶ 18.)  Mrs. Rutstein owned Metro Inc., served as its president, and processed orders and other paperwork as needed.  (*Id.* at 6–7, ¶¶ 14, 26.)  Mrs. Rutstein was not involved in the sale of cabinets for Metro Inc.  (*Id.* at 6, ¶ 32.)  Metro Inc. dissolved on October 1, 2004,  (*Id.* at 8, ¶ 38), and Mrs. Rutstein returned to work full-time for Consumers Digest Magazine.

The existence of Metro Inc. overlapped with that of Metro LLC.  On April 8, 2004, Alan Erickson, a real estate investor and friend of the Rutsteins, organized Metropolitan Kitchen and

---

[2] Defendant Steven Rutstein previously incorporated Design Kitchen & Bath Inc. on February 27, 1998.  (*Id.* at 5, ¶ 7.)  Mr. Rutstein serve as president and owner of Design Kitchen & Bath Inc.  (*Id.* at 5-6, ¶¶ 8-9.)  Mr. Rutstein involuntarily dissolved Design Kitchen & Bath Inc. in July, 2001.

Bath, LLC ("Metro LLC").  (*Id.* at 9, ¶¶ 42, 50.)  Metro LLC employed Mr. Rutstein as a designer and salesman. (*Id.* at 10, ¶ 56.)  Despite being owned by Mr. Erickson, Metro LLC had its principal place of business at the Rutsteins' Wilmette residence, (*Id.* at 9, ¶¶ 47, 50), and Mr. Rutstein was primarily responsible for the kitchen design and cabinet sales aspects of the business.  From at least October 1, 2004 through March 1, 2005, Metro LLC maintained an account with Harris Bank (the "Harris Account"), on which Mr. Rutstein was a signatory.  (*Id.* at 9, ¶¶ 52, 54.)  Although Mrs. Rutstein never worked for Metro LLC, she was also a signatory on the Harris Account and admitted to writing checks from the Metro LLC Account to pay personal expenses.  (*Id.* at 10, ¶ 57.)

### B. The Plaintiffs' cabinet orders

As an initial matter, each of the Plaintiffs ordered cabinets from Metro LLC, although some of the documentation identified Metro Inc.  Plaintiffs attempted to put the transition from Metro Inc. to Metro LLC at issue, but none of them could testify convincingly that they contracted with Metro Inc. as opposed to Metro LLC, or vice versa.  Mr. Rutstein testified that invoices were prepared by his secretary, and that to the extent Defendants received documents identifying Metro Inc., it resulted from a clerical error and that he did not believe that the error affected his dealings with the respective Plaintiffs.  With the exception of Plaintiffs' Exhibit 26, the Gonzales order, these invoices are unsigned.  Plaintiffs produced no other written contracts signed by Mr. Rutstein.

### 1. Eugenie Barsky

On June 1, 2003, Ms. Barsky signed a contract with Avdija Perazic ("Perazic") of Poda construction to remodel her Lincolnwood, Illinois home at a total cost of $275,000.  (Pls.' Ex. 1.)

The contract described the scope of the work as "Build addition on first and second floor on existing house," (*id.* at 1), and provided an estimated time of completion of 120 days. (*Id.* at 2.) The work included gutting the entire kitchen area on the first floor of her home and adding a bedroom.

In late summer or fall 2004, while her home was still under renovation, Ms. Barsky began meeting with Defendant Steven Rutstein to discuss ordering kitchen cabinets. Perazic recommended Mr. Rutstein as a kitchen designer and provided at least one reference who had purchased kitchen cabinets from Mr. Rutstein in the past, with no problems. At some point that fall, Barsky and Rutstein met at Barsky's home for the purpose of discussing her kitchen design. At that time, the home was still under renovation and drywall had not yet been installed in the Barsky kitchen. Mr. Rutstein measured the kitchen area and made drawings that Ms. Barsky approved. On October 5, 2004, Ms. Barsky completed the order and wrote Mr. Rutstein a check for $4,207.00, representing a 50% down payment on the overall cost of the cabinets. (Pls.' Ex. 17.) The terms of the order were credit on delivery ("C.O.D.")—and Mrs. Barsky understood this to mean that she would pay the remaining balance upon delivery of her cabinets.

In late October, 2004, Mr. Rutstein initiated an order with Medallion cabinetry of Waconia, Minnesota for the construction of Ms. Barsky's cabinets. Mr. Rutstein later cancelled the order, however, and Medallion never built Ms. Barsky's cabinets.

Ms. Barsky could not recall when Poda construction finished the renovations, but she testified that she did not receive an occupancy permit until October 2005, more than two years after the renovations began. Ms. Barsky ultimately ordered cabinets from another source at additional expense. Although Ms. Barsky claimed to have documents detailing the extra costs

relating to replacement cabinets, Ms. Barsky never provided those documents to her attorney, despite being requested to do so at her deposition.[3]  Mrs. Barsky could not recall the exact cost of the replacement cabinets.

### 2. Khalid Ali

Mr. Ali hired Perazic and Poda Construction in Spring 2003 to remodel the first floor of his home and build a second floor addition, at a cost of $140,000.  (*See, e.g.,* Pls.' Ex. 9.)  While visiting a plumbing supply store with Perazic, Ali met Rutstein, and Perazic recommended Rutstein as someone with whom he had done business in the past.  Ali eventually ordered cabinets from Rutstein in October 2004, giving Rutstein a 50% deposit of $4,075.00.  (Pls.' Exs. 10, 11, 19.)  Like Barsky's order, Ali agreed to pay the remaining 50% balance upon delivery of the cabinets.

In December 2004, Ali began calling Rutstein to inquire when he might expect his cabinets.  At that time, Ali was living in his father-in-law's basement, awaiting the completion of his home renovation.  Ali planned to store the cabinets in his father's basement until the renovations were complete, but Ali did not communicate his plan to Rutstein.  Instead, Rutstein waited to finalize Ali's order until the renovation was complete and the kitchen could accept cabinets.  Perazic did not complete the renovations until August 13, 2005.

In response to Rutstein's delay, Ali ordered cabinets from another source.  Mr. Ali could not testify with certainty as to the cost of his replacement cabinets.

---

[3]  Nor is it clear whether her attorney asked her for the documents.

### 3. Tejinder Singh

Mr. Singh also hired Poda construction in December 2003 to renovate his home and kitchen. In October 2004, Singh also ordered cabinets from Rutstein, paying a 50% down payment of $4200. (*See* Pls.' Exs. 22, 25.) Like Ali's and Barsky's orders, Singh agreed to pay the remaining 50% balance upon delivery of the cabinets.

Even after ordering cabinets, Rutstein met with Singh an additional three to four times to measure for cabinets and make drawings. When asked if Rutstein explained to Singh that additional measurements would be necessary if the contractor built the room in a manner that differed from the plans, Singh admitted that Rutstein had probably said as much.

By the beginning of 2005, Perazic still had not completed work on Singh's home. Singh fired Poda Construction and hired his own contractors to finish the work. Singh completed the renovations and moved back into his house in December 2005. Nonetheless, Singh claims that after relations soured with Mr. Rutstein and he had to go elsewhere for cabinets, his move-in date was delayed an additional 2 and a half months. Singh also has back-up receipts for the extra costs resulting from the delayed cabinets, and he provided his attorney with canceled checks evidencing extra rent paid during the additional 2.5 months he spent waiting for replacement kitchen cabinets. These documents were not provided to Defendants during the litigation, even though the Defendants contend that they requested the documents. Mr. Singh could not confirm the total additional costs be paid.

### 4. Meleca Durakovic

Ms. Durakovic also hired Perazic and Poda Construction for a full renovation—specifically, to tear her home down to its foundation and rebuild it. According to Ms.

Durakovic, the renovation was supposed to last six months but ended up lasting 21 months. Durakovic also testified that Perazic introduced her to Mr. Rutstein, who first measured for cabinets in January or February of 2005. Durakovic paid for the cabinets in full: $11,000. (*See* Pls.' Ex. 8.)

According to Durakovic, at the time Rutstein measured, the walls were not drywalled, but the windows had been installed, the rough carpentry was in, and one could see the planned location of the kitchen. From this, she assumed that Rutstein could measure and that the house was ready to have the kitchen cabinetry installed. Durakovic admitted, however, that heating and cooling systems were not installed until after Rutstein's visit to her home.

Durakovic testified that after Perazic's delays, she decided to see if she could speed things along and have the kitchen installed, but that Rutstein did not respond to her calls. Durakovic fired Perazic and Poda Construction in January 2006. When she fired Poda, it had not yet completed the floors or drywall in the kitchen—these items were installed toward the end of January 2006. Durakovic purchased cabinets elsewhere, at an additional cost, and moved back into her home in March 2006. Mrs. Durakovic did not confirm the extent of the additional costs.

### 5. Alberto Gonzales

Defendant Gonzales also hired Poda Construction for a tear down renovation. Under the contract, dated July 15, 2003, Gonzales agreed to pay $230,000 for work lasting approximately 150 days. (Pls.' Ex. 6.) In early 2005, Gonzales ordered cabinets from Rutstein for his kitchen, three bathrooms, and laundry room, for a total of $16,941. (Pls.' Ex. 26.) Although Mr. Gonzales initially testified that the work on his kitchen was complete when he ordered the cabinets, he later admitted that the drywall, at least, had not been installed, and so Mr. Rutstein

added a provision into the order that provided, "MKB will also store the kitchen and bath cabinets up to 4 months of their arrival [sic] at no charge to Mr. Gonzales." (*Id.*) Gonzales claimed that this provision was added because timing the renovation was difficult, and he needed a "pad" to ensure that work kept moving forward and cabinet installation was not delayed. Mr. Gonzales gave Mr. Rutstein a deposit of $11,294 on January 13, 2005, with the remaining balance due upon delivery. (Pls.' Ex. 27.) Mr. Gonzales also testified that Mr. Rutstein was extremely helpful early in the process and worked with Mrs. Gonzales to effect multiple order changes. (Defs.' Ex. 20.) Mr. Rutstein testified that Mrs. Gonzales made substantial changes to the Gonzales' cabinet order and that she eventually changed her choice of cabinet design entirely, thus requiring Mr. Rutstein to find a new, custom source for the cabinets. Mr. Gonzales did not receive his cabinets, however, and ultimately ordered cabinets from another source, although he did not provide evidence of the exact cost for the replacement cabinets.

### C.    Relations between the parties sour

Each of the Plaintiffs testified that as renovations stretched on, he or she became frustrated with the delays and Mr. Rutstein's non-responsiveness. Specifically, the Plaintiffs testified that they called Mr. Rutstein often, and that he placated them by telling them that he had already ordered their cabinets and that the cabinets were waiting in Rutstein's warehouse. Some of the Plaintiffs testified that Rutstein even offered to take them to the warehouse to see their cabinets but never followed through with this invitation. Mr. Rutstein denied that he ever told any of the Plaintiffs that their cabinets were waiting in his warehouse.

Mr. Rutstein admitted telling one or more of the Plaintiffs that he had sent in their orders. Specifically, Mr. Rutstein testified that in many cases, he had initiated cabinet orders via

facsimile to Medallion Cabinetry in Minnesota, (Pls.' Ex. 16), but that he later cancelled the orders when he learned of substantial delay in the Plaintiffs' respective renovation projects. To avoid having to pay for months of storage, Mr. Rutstein planned to renew the orders for Plaintiffs' cabinets when the renovation projects neared or reached completion. It is not clear if he communicated his intentions to the Plaintiffs, however, because Plaintiffs believed that Rutstein should have delivered the cabinets to their respective work sites within five weeks after they placed their orders with Rutstein. Mr. Rutstein testified that he would not agree to such a procedure because of the damage that could befall expensive wood cabinetry from being left in an unfinished home without drywall, finished floors, climate control, or front doors—and/or possibly exposed to the elements.

Rutstein testified that the root of the problem was that the general contractor for each of these projects, Avdija Perazic of Poda Construction, did not construct the homes in compliance with the blueprint plans. In many cases, according to Mr. Rutstein, the Plaintiffs' homes, as built, varied so greatly from the original plans that Rutstein would have to re-measure and re-design the cabinet order before ordering the cabinets. Since window, door, and staircase positions changed, and since the cabinetry came in three-inch increments, adjustments would have to be made to the designs *before* the cabinets were built to ensure that the expensive cabinets would fit the space correctly. As to the Gonzales' house, for example, Mr. Rutstein testified that Perazic's construction was a "fiasco" because Perazic built the staircase in the wrong location, blocking access to the kitchen and taking up space otherwise reserved for his cabinetry. In addition, both the Gonzales and the Singh homes suffered delays when the local villages denied occupancy permits due to building code violations. All in all, it took Mr.

11

Gonzales a year and a half to complete his home, acting as his own general contractor, before it was ready for cabinet installation. Had Mr. Rutstein actually placed the cabinet order following the initial meeting with Gonzales, Rutstein feels he would have been responsible for storing the cabinets for the time in excess of the agreed four months, to prevent damage to the cabinets.

Throughout this time frame, as the Plaintiffs grew more frustrated, Mr. Rutstein proceeded with successful cabinet sales to other families. Rutstein testified that Metro LLC did approximately $5 million in cabinet sales during the same time period—including other orders for Medallion cabinets—, and that the vast majority of his deals ended successfully, with satisfied customers. (*See, e.g.,* Defs.' Ex. 8-10, 27.) Plaintiffs offered no testimony from dissatisfied Metro LLC customers who had not also used Perazic and Poda Construction as their general contractor.

### D. August 22, 2005 Letter

In late summer 2005, Mr. Rutstein heard from multiple sources—including Perazic and the Plaintiffs themselves—that one or more of the Plaintiffs planned to take delivery of cabinets from Rutstein and refuse to pay the balance due.[4] Fearing that he might deliver cabinets to a customer unwilling to pay the balance on delivery, Mr. Rutstein, through his attorney, sent a letter to some of the Plaintiffs on August 22, 2005.[5] This letter offered the Plaintiffs a "fair and equitable conclusion" to the "cabinetry dispute." Specifically, the letter offered to accept the balance of the remaining funds into the attorney's client trust account as an escrow, to be

---

[4] For example, Gonzales sent a June 2005 letter to Metro Inc. threatening legal action. (Pls.' Ex. 7.)

[5] Plaintiffs produced no evidence of letters to either Gonzales or Durakovic.

released only after the cabinets were delivered to each respective Plaintiffs' satisfaction.  (*See, e.g.,* Pls.' Ex. 2, 4, 13.)  Both Messrs. Ali and Singh testified to receiving this letter via United States Mail.

Plaintiffs responded to the letters in different ways.  Mrs. Barsky, for example, responded by sending Mr. Rutstein a letter dated August 26, 2005, stating that "we have decided not to have any further business relationship with you or your company" and "[s]ince your delivery did not take place in [sic] timely fashion, we consider you in breach of contract, and we have no more faith in the honesty and capability of your company."  (Pls.' Ex. 3.)  Mrs. Barsky then requested a refund of her deposit and ended the letter by stating, "P.S. We wish you nothing but a lot of satisfied customers in the future life of your company."  (*Id.*)  Mr. and Mrs. Singh responded through their attorney on August 26, 2005, in a letter that admits that the Singh's renovation was over a year and a half behind schedule.  This letter appears to accept Rutstein's proposed compromise, with certain conditions.  (Pls.' Ex. 5.)  The parties offered no testimony, however, as to why the compromise did not come to fruition.  Mr. Ali responded by suggesting that the balance be placed in escrow with a title company.  This proposed compromise was also rejected.

Mr. Rutstein also testified that at one point, he offered to refund the Plaintiffs' deposits, less an amount for his time spent designing their kitchens and baths—as much as 100 to 200 hours per customer, in some instances.  In the cases of Mr. Gonzales and Mrs. Durakovic, for example, Mr. Rutstein offered to refund all but $2000.  Mr. Rutstein testified that the Plaintiffs refused; the Plaintiffs testified that he never made such an offer.  Mr. Rutstein never refunded Plaintiffs' deposits, in whole or in part.

### E.    Lori Weber Rutstein

Although Mrs. Rutstein was involved in the day-to-day operations of Metro Inc., her involvement was limited to clerical work.  In addition, it is undisputed that by the time Metro LLC was formed, she had stopped working with Mr. Rutstein and was working full time for Consumer's Digest.  Indeed, Mr. Ali testified that Mrs. Rutstein was never involved with the cabinet orders and that he had never discussed cabinets with her.  The only involvement alleged by the Plaintiffs is that Mrs. Rutstein had access to the Harris bank account and wrote numerous checks from that account to pay her credit card bills and auto lease payments.  Both of the Rutsteins testified, however, that the leased autos were often used for Metro LLC business, and that Mrs. Rutstein had personally loaned money to Metro LLC and allowed the use of her personal credit cards for LLC business.  The only involvement Mrs. Rutstein had with Plaintiffs was on two occasions when Mr. Gonzales, and separately Mrs. Barsky and the wife of Mr. Ali, went to the Rutstein household to confront Mr. Rutstein.  In each instance, Plaintiffs threatened Mrs. Rutstein when she told Plaintiffs that Mr. Rutstein was not at home.  When Mrs. Barsky and Mrs. Ali went to the Rutstein household, for example, Mrs. Rutstein testified that Mrs. Barsky attempted to push her way into the Rutstein home, and Mrs. Rutstein and had to push the door shut to keep her out.

### ANALYSIS

### I.    Plaintiffs' Civil RICO Claims

The gravamen of Plaintiffs' claims, as alleged in their Amended Complaint ("AC"), and as tried, is that Defendant Rutstein formed Metro Inc. and Metro LLC for the sole purpose of taking people's money and never ordering or delivering cabinets.  Plaintiffs' SAC, operative at

the time of trial, alleged violations of 18 U.S.C. §§ 1962(a), (c), and (d) and 1964(a) and (c).  In support of these allegations, Plaintiffs alleged predicate acts of mail and wire fraud.

### A.	Relevant Legal Standards

The civil RICO statute provides civil remedies to a person "injured in his business or property by reason of a violation" of the criminal RICO statutes.  18 U.S.C. § 1964(c); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453, 126 S. Ct. 1991, 1994, 164 L. Ed.2d 720 (2006).  Specifically, 18 U.S.C. § 1962(c) makes it a crime for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To prove a § 1962(c) claim, Plaintiff must prove the following elements:  (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2137–38, 170 L. Ed.2d 1012 (2008); *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006).  In addition, to show a RICO conspiracy in violation of § 1962(d), "a plaintiff must allege (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals."  *Lachmund v. ADM Inv. Servs., Inc.*, 191 F.3d 777, 784 (7th Cir. 1999) (citations omitted); *see also Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001).  Finally, a violation of § 1962(a) requires that Plaintiffs show "the receipt of income from a pattern of racketeering activity, and the use of that income in the operation of an enterprise."  *Lachmund*, 191 F.3d at 785.

**B.    Conduct of an enterprise**

Under Plaintiff's theory, Metro Inc. and Metro LLC are each the enterprise for the purpose of RICO.  As an initial matter, Plaintiffs failed to show that Mrs. Rutstein "conducted" the enterprise pursuant to § 1962(c).  Specifically, there is no evidence that she participated in directing the affairs of the enterprise.  "[I]n order to have conducted or participated in the enterprise's affairs under § 1962(c), the person charged must have had some part in directing those affairs."  *Slaney*, 244 F.3d at 598 (citing *Reves v. Ernst & Young*, 507 U.S. 170, 179, 113 S. Ct. 1163, 122 L. Ed.2d 525 (1993).  The parties do not dispute that "Lori Rutstein was not involved, directly or indirectly, in the sale of cabinets for Metro Inc."  (R. 95-1, Pretrial Order at 8.)  Mrs. Rutstein performed only clerical work for Metro Inc., at her husband's direction, and she never worked for Metro LLC.  Nor does the fact that she wrote checks from the corporate account suggest control—the undisputed evidence shows that these checks represented reimbursement for personal loans she made to the corporation.

It is undisputed, however, that Mr. Rutstein controlled both Metro Inc. and Metro LLC, directing the daily operations of each company and their respective employees.  During the time when Mrs. Rutstein served as "President" of Metro Inc., for example, Mr. Rutstein testified that Mrs. Rutstein did not direct him in any way.  Consequently, Mr. Rutstein cannot avoid RICO liability merely because he styled himself as an "employee" rather than "president."  *See, e.g., James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 401 (7th Cir. 2006) (to "'participate in the conduct' of a criminal enterprise for the purposes of RICO liability, a defendant must exercise some role in the direction of the enterprise.").

**C.    Racketeering Activity**

A "pattern of racketeering activity" is an element of each of Plaintiffs' RICO claims.  To establish a pattern of racketeering activity, Plaintiffs must show at least two predicate racketeering acts.  *RWB Servs., LLC  v. Hartford Computer Group, Inc.*, 539 F.3d 681, 686 (7th Cir. 2008); *see also* 18 U.S.C. § 1961(5).

Plaintiffs allege predicate acts of wire and mail fraud.  "A defendant commits wire fraud under 18 U.S.C. § 1343, if she: (1) participates in a scheme to defraud; (2) intends to defraud; and (3) causes a wire transmission in furtherance of the fraudulent scheme."  *United States v. Adcock*, 534 F.3d 635, 639 (7th Cir. 2008) (quoting *United States v. Ratliff-White*, 493 F.3d 812, 817 (7th Cir. 2007)).  Similarly, "the only elements of mail fraud are (1) a scheme to defraud (entailing a material misrepresentation), (2) an intent to defraud, and (3) the use of the mails."  *United States v. Sorich*, 523 F.3d 702, 708 (7th Cir. 2008).  In support of both wire and mail fraud, Plaintiffs allege a scheme to defraud them of their deposit money—after which Mr. Rutstein "went through the motions of 'ordering' their cabinets."  (R. 101-1 at 2.)

### 1.  Interstate wire transmission

In support of their wire fraud allegations, Plaintiffs identified (1) intrastate telephone calls between Mr. Rutstein and Plaintiffs; and (2) interstate facsimiles between Mr. Rutstein and Medallion Cabinetry in Minnesota.

To begin with, telephone calls between Mr. Rutstein, in one suburb of Chicago, and one or more Plaintiffs, in other suburbs of Chicago, do not support wire fraud.  Wire fraud requires a wire transmission in interstate commerce—it must travel over interstate wires.  18 U.S.C. § 1343; *United States v. Otto*, 850 F.2d 323, 326 (7th Cir. 1988); *United States v. Freeman*, 524 F.2d 337, 339 (7th Cir. 1975) ("All the statute requires is that there be a scheme to defraud and an interstate

telephone call made in furtherance of the scheme"); *Arenson v. Whitehall Convalescent and Nursing Home, Inc.*, 880 F. Supp. 1202, 1212 (N.D. Ill. 1995).

In their post-trial briefing, Plaintiffs attempt to fudge the interstate requirement and avoid the plain meaning of the wire fraud statute, citing primarily to non-binding precedent to argue that wire fraud merely requires the use of an interstate *instrumentality*. But the only Seventh Circuit case cited by Plaintiffs, *United States v. Catalfo*, does not support their argument. 64 F.3d 1070 (7th Cir. 1995). Contrary to Plaintiffs' characterization of *Catalfo* as being based on intrastate communications, *Catalfo* affirmed a wire fraud conviction based on a facsimile between New York and Chicago. *See Catalfo*, 64 F.3d at 1078 ("The facsimile clearly traveled over interstate wires.").

Plaintiffs next point to facsimiles between Rutstein and Medallion Cabinets in Minnesota as evidence of wire fraud. (*See, e.g.,* Pls.' Ex. 16.) Mr. Rutstein admitted that he sent multiple faxes to the Minnesota cabinet maker for the purpose of initiating orders of Plaintiffs' cabinetry. In addition, Plaintiffs' Ex. 16 includes the fax signature of "Medallion Cabinetry Inc," a "952" area code, and letterhead identifying the location of Medallion as Wauconia, Minnesota. These facsimiles traveled over interstate wires.

### 2. Mailings

In support of the mail fraud allegations, Plaintiffs identify the August 22, 2005 mailing from Mr. Rutstein's attorney that proposed a compromise to multiple Plaintiffs. This letter is sufficient to meet the mailing requirement. *See Bridge v. Phoenix Bond & Indem. Co.*, __ U.S.__, 128 S. Ct. 2131, 2138, 170 L. Ed.2d 1012 (2008) ("[t]he gravamen of the offense is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the mailing

element...even if the mailing itself contains no false information"); *see also United States v. Useni*, 516 F.3d 634, 648 (7th Cir. 2008); *see also United States v. McClain*, 934 F.2d 822, 835 (7th Cir. 1991) (limiting application of the mail fraud statute to instances in which use of the mails is a part of the execution of the fraud).

### 3. In furtherance of a scheme to defraud

Generally, "a mailing or telephone call is not in furtherance of a scheme when it occurs after the scheme has reached fruition." *United States v. Wingate,* 128 F.3d 1157, 1162 (7th Cir. 1997); *see also Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1055 (7th Cir. 1998). Plaintiffs identified facsimiles and mailings that occurred well after Mr. Rutstein accepted Plaintiffs' deposit money. Nonetheless, the facsimiles may still be in furtherance of a scheme if they constitute an effort to "cloak the scheme with an aura of legitimacy, thereby preventing its detection and allowing it to continue." *United States v. Lack*, 129 F.3d 403, 408 (7th Cir. 1997); *Corley*, 142 F.3d at 1056. Three of the Plaintiffs ordered Medallion cabinets, and Mr. Rutstein placed their orders with Medallion via interstate facsimile transmissions, (*see, e.g.,* Pls.' Ex. 16), only to later cancel those orders and never repay Plaintiffs' down payments. To the extent that Mr. Rutstein engaged in a scheme to defraud Plaintiffs of their deposit money, these facsimiles could be seen as an attempt to create a paper trail to suggest legitimate orders, thus in furtherance of the scheme.

In contrast, the August 22, 2005 letter occurred well after the scheme came to fruition. This letter represents Mr. Rutstein's attempt—on the advice of counsel—to settle the dispute. The letter does not suggest an effort to conceal or legitimize the scheme. Consequently, the August 22, 2005 mailing was not in furtherance of a scheme to defraud.

###     4.     Intent to defraud

Intent to defraud is also a required element of both mail and wire fraud.  *United States v. Sloan*, 492 F.3d 884, 890 (7th Cir. 2007).  To prove an intent to defraud, Plaintiffs must show "a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another."  *United States v. Roberts*, 534 F.3d 560, 571 (7th Cir. 2008) (quoting *Sloan*, 492 F.3d at 891).  Intent may be established by "circumstantial evidence and by inferences drawn from examining the scheme itself that demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension."  *United States v. Stephens*, 421 F.3d 503, 509 (7th Cir. 2005) (citations omitted).  As both mail and wire fraud are specific intent crimes, Defendants are "entitled to introduce evidence of good faith or absence of intent to defraud."  *United States v. Warner*, 498 F.3d 666, 691 (7th Cir. 2007) (citing *United States v. Longfellow*, 43 F.3d 318, 321 (7th Cir. 1994)).

Plaintiffs have failed to establish the requisite intent to defraud.  The alleged misrepresentations identified by Plaintiffs amounted to Mr. Rutstein agreeing to order and deliver their cabinet orders.  Plaintiff did not introduce any evidence, however, to suggest that Mr. Rutstein never intended to order Plaintiffs' cabinets.  Indeed, Mr. Rutstein placed some of Plaintiffs' cabinet orders, and canceled them, he credibly testified, only when it became clear that Plaintiffs' homes would not be complete and that he would be forced to store the cabinets for an extended period of time.  Nor can Plaintiffs point to other false statements made to induce them to pay deposit money.

Evidence presented by both parties supports that Mr. Rutstein acted in good faith and

lacked any intent to defraud Plaintiffs. At the same time that Mr. Rutstein was allegedly defrauding the five Plaintiffs, Mr. Rutstein was successfully performing cabinetry contracts with numerous other customers, including orders for Medallion cabinetry. Many of the Plaintiffs testified that they had checked Mr. Rutstein's references and met satisfied past customers. Mr. Rutstein was not a fly-by-night salesman—he has been a kitchen designer for decades. In addition, Plaintiffs admit that Mr. Rutstein visited Plaintiffs' homes multiple times, even after taking their deposit money, to monitor the progress of the renovations, make design and color changes requested by Plaintiffs, and double-check cabinetry measurements. The evidence showed that Mr. Rutstein spent hours of time on this work. Mr. Gonzalez even testified that Mr. Rutstein was extremely helpful throughout the design process.

Nor did Plaintiffs show that Mr. Rutstein was dilatory in ordering the cabinets. Instead, the Court credits Mr. Rutstein's testimony that Plaintiffs' homes simply were not ready for cabinet delivery. Plaintiffs did not dispute this fact. Although Plaintiffs attempted to gloss over this fact, each Plaintiff admitted that his or her home was not finished for months after he or she ordered cabinets from Mr. Rutstein. Many of the Plaintiffs even admitted firing the general contractor, Perazic, due to long delays.

Mr. Rutstein also testified credibly that Perazic built Plaintiffs' homes out of conformance with their blueprint plans. Had Plaintiffs' original cabinet orders been placed when Plaintiffs paid their respective deposits, the custom or semi-custom cabinets would not have fit the kitchen spaces for which they were designed because the kitchens were not built to plan. Plaintiffs were understandably frustrated by years of Perazic's delay. Although Plaintiffs' frustration is understandable, they have failed to show that Mr. Rutstein intended to defraud them.

Nor did Plaintiffs make any attempt whatsoever to establish that Mrs. Rutstein attempted to defraud Plaintiffs. To the contrary, Plaintiffs testified that Mrs. Rutstein was not involved in cabinet orders or sales. Mrs. Rutstein was not even employed by Metro LLC.

Plaintiffs simply have not shown that either Mr. Rutstein or Mrs. Rutstein intended to defraud them. A "[b]reach of contract is not fraud; only making a promise with the intent not to keep it deserves that epithet." *Perlman v. Zell*, 185 F.3d 850, 852 (7th Cir. 1999). This case represents an unsuccessful attempt by Plaintiffs' initial attorney to use the "flexibility" of the civil RICO statute "in order to exploit RICO's provisions for treble damages and attorney's fees." *Doe v. Roe*, 958 F.2d 763, 765 (7th Cir. 1992). Accordingly, the Court finds that the Plaintiffs have not proven their RICO claim by a preponderance of evidence.

## II. Plaintiffs' Post-Trial Motion for Leave to File a Third Amended Complaint

Concurrently with their post-trial briefing on their civil RICO claims, Plaintiffs filed a motion for leave to file a third amended complaint, seeking to add two new claims for relief— "Breach of Contract, Fraud" under Illinois law and violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1, *et seq*. ("ICFA"). Defendants did not respond to Plaintiffs' motion and instead filed their responsive post-trial briefing limited solely to Plaintiffs' civil RICO claim. (*See* R. 103-1, Defs.' Post-trial Br. at 1, n.1 ("Defendants are addressing the issues based upon the evidence adduced at trial and the issues as framed by Plaintiffs' First Amended Complaint, which the trial was based upon.").)

### A. Rule 15(b) requires trial by consent

Plaintiffs correctly note that Rule 15(a) provides that leave to amend be freely granted. (R. 102-1, Pls.' Mot. at 1.) Although Rule 15(a) does instruct that the Court "should freely give

leave when justice so requires," Fed. R. Civ. P. 15(a)(2), Rule 15(b)(2) applies to amendments

during and after trial. Specifically, as this requested amendment did not arise out of Defendants'

objections at trial, Rule 15(b)(2) applies. Rule 15(b)(2) provides:

> For Issues Tried by Consent. When an issue not raised by the pleadings is tried by
> the parties' express or implied consent, it must be treated in all respects as if raised
> in the pleadings. A party may move—at any time, even after judgment—to amend
> the pleadings to conform them to the evidence and to raise an unpleaded issue.
> But failure to amend does not affect the result of the trial of that issue.

Fed. R. Civ. P. 15(b)(2).

Consent under Rule 15(b) is a prerequisite to a post-trial amendment—Rule 15(b) does

not grant a mulligan to parties unprepared for trial. *See Freeman v. Chicago Park Dist.*, 189 F.3d

613, 618 (7th Cir. 1999); *Burdett v. Miller*, 957 F.2d 1375, 1380-81 (7th Cir. 1992) ("a plaintiff

who fails at trial to prove an essential element of his case may not retry the case on a different

theory.") (citations omitted). To determine whether there was express or implied consent, the

district court must "ascertain whether the opposing party had a fair opportunity to defend and

whether he could have presented additional evidence had he known sooner the substance of the

amendment." *In re Rivinius, Inc.*, 977 F.2d 1171, 1175 (7th Cir. 1992) (citations omitted)

(finding no consent where issue was not raised until post-trial briefing and evidence relevant to

claim was not properly before the court). In addition, "a court will not imply consent to try a

claim merely because evidence relevant to a properly pleaded issue incidentally tends to establish

an unpleaded claim." *Ippolito v. WNS, Inc.*, 864 F.2d 440, 456 (7th Cir. 1988) (citation omitted).

In *Burdett,* for example, the plaintiff failed at trial to prove that an accounting firm

constituted a RICO enterprise. Following a bench trial, the district judge *sua sponte* held that the

plaintiff had proved that four members of the accounting firm formed an "enterprise" within the

meaning of the RICO statute.  Since the district judge did not raise her concerns at trial or allow

the parties to file post-trial briefs, however, the defendant had no warning that "evidence

manifestly admissible because relevant to the conspiracy charge would also be used to establish

the existence of an enterprise to which no one in the course of this litigation had alluded."

*Burdett,* 957 F.2d at 1380.  Judge Posner also suggested that had the judge raised the lack of proof

at trial, Rule 15(b) might have assisted the parties:

> When the unfolding evidence persuaded the district judge that the plaintiff's
> counsel had misidentified the RICO enterprise, she could without impropriety have
> invited him to shift the line of his attack, and if he had taken up the invitation the
> defendant could have sought to parry the attack.  The judge did not do this but
> instead changed the plaintiff's theory of the case after the time had passed for the
> defendant to present contrary evidence.

*Burdett*, 957 F.2d at 1380.

A party may not remain silent, however, passively allowing evidence to come in and hope

to avoid application of Rule 15(b).  In *Torry v. Northrup Grumman Corp.,* the plaintiff appealed

the district court's grant of summary judgment on the plaintiff's age and race discrimination

claims.  399 F.3d 876, 877 (7th Cir. 2005).  Although the plaintiff's Complaint pled only age

discrimination claims, she engaged in lengthy discovery—largely unopposed by defendant—

aimed at both age and racial discrimination claims.  *Id.*  The Seventh Circuit held that the

defendants' participation in such broad discovery without objection suggested that the defendants

impliedly consented to trying the race discrimination claims.  *Id.* at 879.  Examining the language

of Rule 15(b), specifically that "failure to amend does not affect the result of the trial of that

issue," Judge Posner also observed that, in many cases, a defendant may prefer to move to

conform the pleadings to the evidence, so as to "simplify proof of res judicata or collateral

estoppel," but that nothing required that the plaintiff expressly move.  *Id.*

At the end of the first day of trial in this case, the Court expressed substantial concerns with Plaintiffs' RICO claims. Plaintiffs' counsel responded by suggesting that Plaintiffs might offer an amendment, but by day two, Plaintiffs had not done so. Nor had Plaintiffs provided any notice to Defendants as to what such an amendment might include. Plaintiffs certainly did not disclose that they intended to bring new causes of action in their amendment. Defendants therefore had no notice of Plaintiffs' additional theories or a full and fair opportunity to expressly consent or object. Plaintiffs' amendment may survive, then, only if the evidence adduced at trial and the parties' positions in their post-trial briefings suggest the parties have impliedly consented to trial of Plaintiffs' proposed breach of contract, fraud, and ICFA claims.

### B.     Plaintiffs' breach of contract clam was not tried by consent

To prove a breach of contract under Illinois law, a plaintiff must show: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007); *see also Zirp-Burnham, LLC v. E. Terrell Assoc., Inc.*, 356 Ill. App.3d 590, 600, 292 Ill. Dec. 289, 826 N.E.2d 430 (App. Ct. 2005).

Plaintiffs did not try a breach of contract case, however, and so the Defendants had no opportunity at trial to raise any defenses to this breach of contract claim. The UCC generally requires that contracts for the sale of more than $500 in goods be in writing and signed by the party against whom enforcement is sought. *See Jannusch v. Naffziger*, 379 Ill. App.3d 381, 385, 883 N.E.2d 711, 715, 318 Ill. Dec. 480, 484 (App. Ct. 2008); 810 ILCS 5/2-201(1) (West 2004)). Despite alleging that Mr. Rutstein breached contracts with each of the five defendants, the Plaintiffs produced only one written contract that includes Mr. Rutstein's signature—Plaintiffs'

25

Exhibit 26, the January 7, 2005 order for the Gonzales' cabinets. Because Plaintiffs sought to change their theory only after the bench trial concluded, however, Defendants could present no additional evidence to refute the existence of contracts as to the other four defendants or otherwise refute a breach of contract claim relating to Plaintiffs' Exhibit 26, including, but not limited to, the defenses of mutual mistake, failure to perform, and anticipatory repudiation. *See, e.g.,* 810 ILCS 5/2-610. Accordingly, the Court finds that the Defendants did not impliedly consent to try a breach of contract claim. *Rivinius*, 977 F.2d at 1177.

### C. The Parties did not try promissory fraud by consent

Read generously, Plaintiffs' fifth claim for relief also pleads, in the alternative, common law fraud. (R. 101-2; Pls.' Third Am. Compl. at 12.) To prove common law fraud under Illinois law, the plaintiff must establish: "(1) the defendant made a false statement of material fact; (2) the defendant knew or believed that the statements were false, or the statements were made with a reckless disregard of whether they were true or false; (3) the statements were made with the intent to induce action; (4) the plaintiff reasonably believed the statements and justifiably acted in reliance on those statements; and (5) the plaintiff suffered damages as a result." *Kapelanski v. Johnson*, 390 F.3d 525, 530 -531 (7th Cir. 2004) (*citing Soules v. Gen. Motors Corp.*, 79 Ill.2d 282, 37 Ill. Dec. 597, 402 N.E.2d 599, 601 (1980)).[6]

Common law fraud is not an analog for breach of contract. Illinois courts have long held that "actionable fraud cannot be predicated upon the mere failure to perform a promise, though

---

[6] In addition, fraud requires heightened pleading pursuant to Fed. R. Civ. P. 9(b), as well as proof by "clear and convincing evidence," as opposed to the lesser "preponderance of the evidence" standard that governs breach of contract. *Extra Equipamentos E Exportacao Ltda. v. Case Corp.,* 541 F.3d 719, 723–724 (7th Cir. 2008) (applying Illinois law; citations omitted); *see also Kapelanski,* 390 F.3d at 530 -531.

there was no intention to perform the promise when made." *Willis v. Atkins*, 412 Ill. 245, 259, 106 N.E.2d 370, 377 (1952). More specifically, to be actionable as fraud, the misrepresentation must be one of fact. *See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 168, 545 N.E.2d 672, 682, 137 Ill. Dec. 19, 29 (1989) ("misrepresentations of intention to perform future conduct, even if made without a present intention to perform, do not generally constitute fraud"); *Prime Leasing, Inc. v. Kendig*, 332 Ill. App.3d 300, 309, 265 Ill. Dec. 722, 773 N.E.2d 84 (App. Ct. 2002) ("Statements regarding future events are considered opinions, not statements of fact ... Even a false promise of future conduct with no current intent to fulfil that promise will not constitute fraud.").

Illinois courts recognize an exception to this rule, however, where "such promises are actionable if the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *HPI*, 131 Ill.2d at 168, 545 N.E.2d at 682, 137 Ill. Dec. at 29 (citation omitted); *Steinberg v. Chicago Med. School*, 69 Ill.2d 320, 334, 13 Ill. Dec. 699, 706, 371 N.E.2d 634, 641 (1977); *Chatham Surgicore, Ltd. v. Health Care Serv. Corp.*, 356 Ill. App.3d 795, 804, 292 Ill. Dec. 534, 541, 826 N.E.2d 970, 977 (App. Ct. 2005); *see also Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 732 n.4 (7th Cir. 2008). This "promissory fraud" theory "is a disfavored cause of action in Illinois because fraud is easy to allege and difficult to prove or disprove." *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992). Nonetheless, the promissory fraud exception applies where "a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment." *Id.* at 1011-12 (citing *Concord Indus., Inc. v. Marvel Indus. Corp.*, 122 Ill. App.3d 845, 78 Ill. Dec. 898, 901, 462 N.E.2d 1252, 1255 (1984);

*Price v. Highland Cmty. Bank*, 722 F. Supp. 454, 460 (N.D. Ill. 1989) (Posner, J.) ("[I]f the intention behind the intentionally false promise is to induce the promisee to act for the promisor's benefit, the promise is actionable.")).[7]

Plaintiffs' fifth claim identifies various oral representations made to Plaintiffs suggesting that "cabinetry orders had (a) been placed with the manufacturer and was [sic] in production, (b) had been manufactured, shipped and received by [Mr. Rutstein], and (c) were then in storage in his warehouse and ready to deliver to their respective job sites."  (R. 101-2 at ¶ 41.)  None of these representations supports traditional common law fraud.  Mr. Rutstein made these statements well after Plaintiffs entered into their respective cabinet orders, and there is no suggestion that any of the Plaintiffs relied on these statements in deciding to order from Mr. Rutstein.  In addition, there is little to support the suggestion that Plaintiffs relied on these statements in forbearing from any specific action—at the time Mr. Rutstein made these statements, Plaintiffs' respective kitchens were incomplete and in no condition to receive cabinet installations.

Plaintiffs did not prepare or try a promissory fraud case, and nothing in Defendants' post-

---

[7] This cause of action was described by the Illinois Supreme Court in *Willis v. Atkins*, 412 Ill. 245, 106 N.E.2d 370 (1952), in the context of a broken marital engagement:

> We are aware of...the general rule but believe it has no application to a situation such as that presented here, where the fraud was perpetrated and the confidence gained not by mere promises but by a course of conduct covering a period of almost twelve years in which appellee, by pretending great interest in the appellant's welfare and devotion to her affairs, secured not only her property but a large measure of his support.  During all those years, he came to appellant's home almost daily, ate his meals with her and handled her business affairs.... The appellee, by all of his conduct, and not by mere promises, falsely represented that he and the appellant were building together for a rosy future, while all the time he was interested only in what he could get from her.

*Willis*, 412 Ill. at 259-260, 106 N.E.2d 370.

28

trial briefs suggests that they defended such a case.[8]  Instead, the evidence at trial suggested that

Rutstein met with Plaintiffs multiple times because he was a kitchen designer trying to ensure

satisfied customers while dealing with monumental scheduling delays brought on by an

overwhelmed and/or inept general contractor.

### D.      Plaintiffs' Illinois Consumer Fraud Act Claim was not tried by consent

The TAC also includes allegations relating to the Illinois Consumer Fraud Act ("ICFA").

This amendment fails for the same reasons as the breach of contract and promissory fraud claims:

Defendants did not expressly or impliedly consent to try this claim.  It is impossible to anticipate

how Defendants' theories would have changed had Defendants been aware that Plaintiffs

intended to try an ICFA claim.  By way of just one example, Defendants focused their defense on

disproving allegations of fraud, not "unfair" trade practices.

In addition, Plaintiffs did not establish an ICFA violation.  "Under the ICFA, a statement

or omission is deceptive if it creates the likelihood of deception or has the capacity to deceive.  If

other information disclosed or available to the consumer dispels any tendency to deceive, there is

no deception."  *Trujillo v. Apple Computer, Inc.*, --- F. Supp.2d ---, Case No. 07 C 4946, 2008

WL 4412115, *2–3 (N.D. Ill. Sept. 23, 2008) (citing *Bober v. Glaxo Wellcome PLC*, 246 F.3d

934, 938 (7th Cir. 2001).  Plaintiffs allege that Mr. Rutstein defrauded them by taking their

money and not ordering cabinets.  But the evidence shows that he ordered the cabinets.  (Pls.' Ex.

16.)  As to the delay, the evidence shows that Mr. Rutstein simply wanted to wait to finalize the

---

[8]  Nor is it at all persuasive that promissory fraud and mail fraud share the common element of a "scheme to defraud."  Defendants' failure to defend a promissory fraud case cannot support implied consent.  The Court will not imply consent simply because "evidence relevant to a properly pleaded issue incidentally tends to establish an unpleaded claim."  *Ippolito*, 864 F.2d at 456 (citation omitted).

orders until he could confirm that Plaintiffs' homes were complete and that his measurements were accurate.  The Court is unwilling to find fraud from these facts.

### E.     Damages

One final concern exists regarding Plaintiffs' TAC—the new claims rely on damages that Plaintiff cannot prove.  Plaintiffs' new claims are based wholly on statements made long after plaintiffs provided their deposits.  (*See* R. 101-2; Third Am. Compl. at ¶¶ 40, 38.[9])  The measure for damages, then, would most properly be the excess amounts paid by Plaintiffs to purchase new cabinets and/or rent additional housing for a longer time while they waited for their cabinets.[10] But none of the Plaintiffs could testify with certainty as to what their total costs were—each of them had difficulty recalling exactly what additional costs they paid and how much they paid. Even more troubling is that Plaintiffs claimed to possess documents detailing these costs that they never produced, despite Defendants' discovery requests.  Rule 26(a) requires disclosure of this evidence—directly related to Plaintiffs' damages computation.  *See* Fed. R. Civ. P. 26(a)(1)(A)(iii).  The sanction for withholding such information is exclusion.  In fact, the Seventh Circuit has stated that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (quoting *Salgado v. Gen. Motors Corp.*,

---

[9]  Plaintiffs' TAC includes two paragraphs labeled "38."  In this citation, the Court refers to the Paragraph 38 included under the heading, "Fifth Claim for Relief."

[10]  *See, e.g., Emerald Inv. Ltd. P'ship v. Allmerica Fin. Life Ins. and Annuity Co.*, 516 F.3d 612, 619 (7th Cir. 2008) ("Damages for breach of contract are intended to give the plaintiff the difference between where he would have been financially had the contract not been broken, and where he is in fact.").  To the extent that Plaintiffs claim damages from a breach of contract, they must prove the additional monies paid to obtain replacement cabinets.

150 F.3d 735, 742 (7th Cir.1998)); *see also Carroll v. Acme-Cleveland Corp.*, 955 F.2d 1107, 1115 -1116 (7th Cir. 1992) (affirming district court's exclusion at trial of documents not produced during discovery). Plaintiffs made no attempt whatsoever to argue that the lack of disclosure was justified or harmless. The inability to prove damages is fatal to Plaintiffs' claims. *See, e.g., Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 540–541 (7th Cir. 2008); *Cummins Engine Co.*, 491 F.3d at 631 ("[m]erely showing that a contract has been breached without demonstrating actual damages dose not suffice ... to state a claim for breach of contract.")

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' motion for leave to file a third amended complaint. In addition, the Court finds in favor of the Defendants because Plaintiffs failed to prove their RICO claim at trial by a preponderance of the evidence.

DATED: November 24, 2008

**ENTERED**

AMY J. ST. EVE
United States District Court Judge